STATE OF NEBRASKA, APPELLEE, V.
DARYLE M. DUNCAN, APPELLANT.

657 N.W.2d 620

Filed March 7, 2003. No. S-01-1256.

Michael F. Maloney for appellant.

Don Stenberg, Attorney General, and Susan J. Gustafson for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

MCCORMACK, J.

## NATURE OF CASE

Daryle M. Duncan was convicted of first degree murder and use of a deadly weapon to commit a felony in connection with

the December 4, 1999, death of Lucille Bennett. Duncan received consecutive sentences of life in prison on the murder charge and 19 to 20 years' imprisonment for use of a deadly weapon to commit a felony. Duncan appeals.

## BACKGROUND

Shortly before 10:30 a.m. on Sunday, December 5, 1999, the body of Bennett was found in her home in Omaha, Nebraska. Bennett died from a stab wound to the right side of the neck, which penetrated two major arteries in the neck. Duncan was later arrested and charged with first degree murder and use of a deadly weapon to commit a felony in connection with the crime.

One of the State's primary witnesses at trial was Jaahlay Liwaru, Duncan's ex-wife. At the time of Bennett's murder, Liwaru was living in a drug treatment center to treat her addiction to crack cocaine. Duncan and Liwaru had agreed that Duncan would cash Liwaru's government assistance check and bring the money to Liwaru on December 3, 1999. Duncan did not show up that day or the next day.

Liwaru testified that between 1 and 3 a.m. on December 5, 1999, she received a telephone call from Duncan. Duncan told Liwaru that he did not have her money from the assistance check, which Liwaru interpreted to mean that he had used the money to buy drugs. Duncan went on to tell Liwaru that the "lady across the street" had been murdered. Duncan and Liwaru had previously lived directly across the street from Bennett. Liwaru also testified that Duncan told her that the lady had "gotten sliced from . . . neck to neck . . . and she got stabbed up." Duncan also told Liwaru that he was going to go to hell. After Liwaru replied that he would not be going to hell for spending her money, Duncan replied, "[W]hat if I told you I killed Ms. Bennett." Immediately after the telephone call, Liwaru shared what Duncan had told her with Jennice Chanel, a patient at the treatment center. Chanel's testimony at trial of what Duncan told Liwaru was consistent with what Liwaru personally testified to.

Liwaru testified that she received another telephone call from Duncan shortly after 10 a.m. that same day. During the second telephone call, Duncan told Liwaru that he had seen Bennett being removed from her home. Other testimony from police and

other authorities at Bennett's home established that Bennett's body was not removed from her home until approximately 7 p.m. on December 5, 1999. Immediately following this call, Liwaru told Margaret Nocita, an employee of the center, that her neighbor had been murdered and robbed. The State later called Nocita, who verified Liwaru's testimony.

The State also called Bill Gartside, a criminologist in the DNA serology section of the Nebraska State Patrol laboratory. Gartside examined a number of hairs from Bennett's home and found that several were consistent with a reference sample of hairs collected from Duncan's dogs. Another hair found at Bennett's house possessed some similar characteristics as well as dissimilar characteristics with a reference sample of hairs from Duncan. Gartside testified that the major dissimilarity in the hair found at the scene and Duncan's reference hair sample was the manner in which it was cut. Duncan objected to Gartside's qualification as an expert in hair analysis and made a motion in limine to preclude Gartside from offering any testimony regarding hair analysis. Both the objection and motion were overruled.

At the conclusion of the trial, the jury found Duncan guilty of first degree murder and use of a deadly weapon to commit a felony. He received consecutive sentences of life in prison on the murder charge and 19 to 20 years' imprisonment for use of a deadly weapon to commit a felony.

Additional facts relevant to the resolution of each of Duncan's assignments of error are recited in detail below.

## ASSIGNMENTS OF ERROR
Duncan first assigns that the district court committed prejudicial error when it commented to the jury panel that it was " '[t]he attorney for the defendant's job . . . to resist the State's case and prove his client innocent if necessary.' " Brief for appellant at 18.

Duncan also claims that the jury was allowed to consider inadmissible evidence due to either the district court's erroneous evidentiary rulings or trial counsel's ineffective assistance. Specifically, the evidence Duncan takes exception to is (1) William Jadlowski's testimony on the subject of hair transfer, (2) the testimony of Chanel and Nocita regarding statements made to them by Liwaru, (3) Steven Henthorn's testimony regarding

Crimestoppers tips received by the police, (4) Gartside's testimony in the field of hair analysis, (5) Jeffrey Harrington's testimony that Duncan's physical appearance had changed over the years and that it appeared Duncan's life had taken a different turn, and (6) Liwaru's testimony that a pot found in Bennett's home belonged to Duncan.

## STANDARD OF REVIEW

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Pruett*, 263 Neb. 99, 638 N.W.2d 809 (2002).

## ANALYSIS

### DISTRICT COURT'S COMMENT

On March 26, 2001, jury selection in Duncan's trial began with the court's calling and swearing in a number of prospective jurors. Shortly after the State began questioning the panel, a prospective juror expressed concern about his ability to participate in a trial and return a guilty verdict which might later lead to a death sentence. The State responded by asking several questions of the prospective juror in an attempt to determine if the prospective juror could still act in a fair and impartial manner. The court also entered the discussion, stating:

[L]et me put it another way. Everybody in the courtroom has a job to do. The prosecution is to prosecute the case. Her job is to prove the defendant guilty beyond a reasonable doubt. The attorney for the defendant's job is to resist the State's case and prove his client innocent if necessary. The court reporter's job is to write down everything that is said in the courtroom. It's my job to referee this affair, and if a verdict of guilty is returned, to set the penalty. That's all I can tell you. Everybody has a different job to do. Does that help?

In his first assignment of error, Duncan argues that the district court committed prejudicial error when it commented to the jury panel that " '[t]he attorney for the defendant's job is to resist the State's case and prove his client innocent if necessary.' " Brief

for appellant at 18. As a result, Duncan claims he is entitled to a new trial. Duncan characterizes the court's comment as a jury instruction. However, when viewed in context, it is clear that the district court was not attempting to instruct the jury panel on the applicable law. Instead, the court was merely commenting to one potential juror about the roles played by various participants in the trial.

We have said that trial courts should refrain from commenting on evidence or making remarks prejudicial to a litigant or calculated to influence the minds of the jury. *State v. Red Kettle*, 239 Neb. 317, 476 N.W.2d 220 (1991). To establish reversible error, a defendant must demonstrate that a trial court's conduct, whether action or inaction during the proceeding against the defendant, prejudiced or otherwise adversely affected a substantial right of the defendant. *State v. Privat*, 251 Neb. 233, 556 N.W.2d 29 (1996). While the inaccuracy of the district court's comment is obvious, the record fails to show that Duncan was prejudiced by the court's comment.

Throughout the daylong voir dire, both the State and defense made numerous mentions to the jury panel of the "presumption of innocence" to be applied in Duncan's favor or to the standard of "proof beyond a reasonable doubt." At one point, Duncan's trial counsel pointed out the district court's error and told the jury panel:

> I'm not sure when it was mentioned, but it was mentioned this morning that Mr. Duncan may have to prove himself innocent or something like that. That may not be the exact words, but all of you must understand that the burden is upon the State of Nebraska to prove him guilty.

After the jury was selected and sworn in, the district court issued its preliminary instructions to the jury. Those preliminary instructions correctly instructed that "[t]he Defendant is presumed to be innocent. This presumption of innocence is evidence in favor of the Defendant and continues throughout the trial, until he shall have been proved guilty beyond a reasonable doubt." The court also issued a preliminary instruction to the jury regarding reasonable doubt that closely resembled the approved instruction in *State v. McHenry*, 247 Neb. 167, 525 N.W.2d 620 (1995). Finally, the district court issued final, written instructions to the

jury at the close of the weeklong trial identical to those preliminary instructions mentioned above.

Viewing the erroneous comments at issue here in combination with the comments of the parties during jury selection, the accurate preliminary instructions, and the accurate final instructions, we conclude that Duncan suffered no prejudice as a result of the comment.

### WILLIAM JADLOWSKI

Jadlowski, a sergeant with the Omaha Police Department, was one of the investigating officers at Bennett's home and testified generally as to the evidence found at the scene. Among these pieces of evidence were several sheets from Bennett's bed, which were sent to the Nebraska State Patrol for examination for the presence of any hairs. On cross-examination, Duncan's trial counsel asked Jadlowski whether hairs could be transferred by a person's walking from room to room and across floors and carpet such as those found in Bennett's home. Jadlowski answered yes. On redirect, the State then asked the following questions of Jadlowski:

Q. If you're walking along the floor, Detective Jadlowski, where will that hair — hair needs friction to adhere to something, doesn't it?

A. Typically, yes.

Q. All right. And so [i]f I'm walking on something and there happens to be a hair on the floor, in order for that hair to get on my bed, my foot with my shoe or sock or whatever is on my foot, has to come up and actually come in contact with the pillow, wouldn't it, to transfer it?

A. I think that's reasonable.

Q. I mean, there's not hairs floating around that just fall into a particular area, true?

[Defense:] I object to the form of the question, speculation and leading.

THE COURT: You may answer.

[A.] I think that's reasonable, yes.

Q. . . . . It's like blood. It's transferred by contact, fair?

A. Yes.

Duncan claims that the district court erred when it overruled his objection above because without foundation to show

Jadlowski to be an expert in the field, the question called for speculation. With respect to those questions above which were not objected to, Duncan also claims he received ineffective assistance of counsel. We note that Duncan's trial counsel was different than his current counsel on this direct appeal.

■ A party who fails to make a timely objection to evidence waives the right on appeal to assert prejudicial error concerning the evidence received without objection. *State v. Harms*, 263 Neb. 814, 643 N.W.2d 359 (2002), *modified on other grounds* 264 Neb. 654, 650 N.W.2d 481. However, Duncan may assert his claim of ineffective assistance of counsel because of the failure of his counsel to object. See, generally, *State v. Hansen*, 252 Neb. 489, 562 N.W.2d 840 (1997).

■ To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense. *State v. Dean*, 264 Neb. 42, 645 N.W.2d 528 (2002). A claim of ineffective assistance of counsel need not necessarily be dismissed merely because it is made on direct appeal; the determining factor is whether the record is sufficient to adequately review the question. *State v. Long*, 264 Neb. 85, 645 N.W.2d 553 (2002).

Duncan claims that each of the questions set forth above called for expert opinion under Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 1995). Duncan claims the State did not lay the proper foundation to qualify Jadlowski as an expert on the "electro-magnetic properties of hair transfer." Brief for appellant at 25. The State admits that Jadlowski was not qualified as an expert, but argues that this step was unnecessary because his testimony did not consist of "scientific, technical, or other specialized knowledge" under rule 702. We agree. The fact that hairs may stick to a person and be moved to a new location is not of such a scientific, technical, or specialized nature as to require expert qualification. Rule 702 provided no basis on which to object to Jadlowski's testimony. Thus, the district court did not err in overruling Duncan's objection, and Duncan cannot prove his trial counsel's performance was deficient. This assignment of error is without merit.

JENNICE CHANEL AND MARGARET NOCITA

Duncan next claims that the district court erroneously overruled his hearsay objections when Chanel and Nocita testified as to what Liwaru said to them after the two telephone calls on December 5, 1999.

The State argues that Liwaru's statements to Chanel and Nocita were not hearsay, and thus admissible, under Neb. Evid. R. 801(4), Neb. Rev. Stat. § 27-801(4) (Reissue 1995), which provides:

A statement is not hearsay if:

(a) The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . (ii) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive[.]

Prior consistent out-of-court statements are defined as nonhearsay and are admissible to rebut a charge of recent fabrication, improper influence, or improper motive only when those statements were made before the charged recent fabrication, improper influence, or improper motive. *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998).

There is no dispute that Liwaru testified at trial and was subject to cross-examination concerning her statements to Chanel and Nocita. Those statements were also consistent with Liwaru's trial testimony. The issue remaining is whether Liwaru was expressly or impliedly charged with recent fabrication or improper influence or motive, or whether Duncan's cross-examination merely attempted to impeach Liwaru. We have said that attempts at impeachment cannot be equated to charges of recent fabrication. *State v. Buechler*, 253 Neb. 727, 572 N.W.2d 65 (1998). " 'One may impeach for lack of credibility without going so far as to charge recent fabrication. . . . We will not find abuse of discretion where . . . the impeachment is susceptible of either interpretation.' " *Id.* at 733, 572 N.W.2d at 70, quoting *Thomas v. U.S.*, 41 F.3d 1109 (7th Cir. 1994).

During Liwaru's cross-examination, the defense journeyed beyond mere impeachment and impliedly charged Liwaru with fabrication. The defense explored Liwaru's statements made

to police on December 10, 1999. Liwaru admitted on cross-examination that she told the police that her telephone calls with Duncan may have occurred on December 6 or on the evening of December 5. The defense asked Liwaru how many versions of the telephone calls she shared with the police, to which Liwaru replied "probably a couple." The defense also asked Liwaru if Duncan had ever told her that he was involved in the murder of Bennett. Liwaru answered that he had not. These questions exhibit the defense's implied charge that Liwaru had fabricated her trial testimony regarding the content of the two December 5 telephone calls from Duncan. Therefore, the State was entitled to offer the testimony of Chanel and Nocita to rebut such charge.

#### STEVEN HENTHORN

Next, Duncan argues that he was prejudiced by the district court's erroneous evidentiary rulings and trial counsel's ineffective assistance with regard to Henthorn's testimony of Crimestoppers telephone calls.

Henthorn was the lead investigator assigned to the case and testified generally as to the investigation of Bennett's murder. The specific portions of Henthorn's testimony on direct examination and redirect examination at issue here are set forth below.

Q. Let me ask you, on December 5th or December 6th — and I don't want you to tell me anything about what was said — but on December 5th or 6th of 1999, were there Crime Stoppers reports coming in to the police department about this murder?

[Defense]: I'll object on relevance. Calls for a hearsay response.

[State]: I'm not asking him what was in them. I just wanted to know if they were coming in.

[Defense]: Relevance.

THE COURT: You may answer.

[A.] No, we were not.

. . . .

Q. . . . On the 7th of December, did Crime Stoppers calls — did you have any Crime Stoppers calls?

[Defense]: Objection, relevance. Calls for hearsay response.

[State]: Not what was in them.

THE COURT: Crime Stoppers calls in connection with what?

[State]: Regarding the murder of Lucille Bennett.

THE COURT: You may answer.

[A.] Yes, we did.

Q. . . . About what time was that?

A. I believe it was about 9:30 in the morning.

Q. Okay. And at some point in time did you begin investigating Mr. Duncan?

A. Yes.

Q. When was that?

A. About 9:30 in the morning —

Q. Okay.

A. — on the 7th of December.

Q. Okay. Did — what did you do after — at some point in time you got some information that Mr. Duncan — you started looking at him?

A. Yes.

. . . .

Q. . . . And did you get — in this particular case, did you get Crime Stoppers reports before — how many Crime Stoppers reports did you get before the 10th of December?

[Defense]: Objection, relevance, foundation.

THE COURT: You may answer.

[A.] Two.

 Duncan argues that the district court erred in overruling his relevance and hearsay objections above. Duncan further argues that this testimony was unfairly prejudicial because it allowed the jury to infer that someone called Crimestoppers and identified Duncan as a suspect. However, an objection, based on a specific ground and properly overruled, does not preserve a question for appellate review on any other ground. *State v. Timmens*, 263 Neb. 622, 641 N.W.2d 383 (2002). A trial court is required to weigh the danger of unfair prejudice against the probative value of the evidence only when requested to do so at trial. *State v. Schrein*, 244 Neb. 136, 504 N.W.2d 827 (1993). Duncan did not object to any portion of Henthorn's testimony under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue

1995), and we will not analyze the issue under that rule. Instead, we consider whether the evidence had any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would have been without the evidence, Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 1995), and also whether Henthorn's testimony was inadmissible hearsay.

We determine that the district court properly overruled Duncan's hearsay objections. Under § 27-801(3), hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. *State v. Pruett*, 263 Neb. 99, 638 N.W.2d 809 (2002). A statement is defined in part as an oral or written assertion. § 27-801(1). The two questions objected to by Duncan on hearsay grounds asked whether and when the police received any Crimestoppers calls. These questions did not call for an oral or written assertion made by an out-of-court declarant, and the content of those calls were never explicitly divulged.

However, we conclude that the district court erred in overruling Duncan's relevance objections. An erroneous admission of evidence is considered prejudicial to a criminal defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt. *State v. Sheets*, 260 Neb. 325, 618 N.W.2d 117 (2000). See, also, *State v. Rieger*, 260 Neb. 519, 618 N.W.2d 619 (2000). Harmless error review looks to the basis on which the jury actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error. *State v. Brouillette, ante* p. 214, 655 N.W.2d 876 (2003).

Despite the court's erroneous admission of this evidence, we conclude, on these facts, that Duncan's conviction was surely unattributable to this error. The testimony of Liwaru, corroborated by Chanel and Nocita, established that Duncan was privy to details of Bennett's murder before Bennett's body was discovered and reported to police. Duncan also told Liwaru during one of the December 5, 1999, telephone calls that he murdered Bennett. This

evidence supports Duncan's conviction and renders the court's erroneous admission of Henthorn's testimony harmless.

■ For those questions above where no objection was made, Duncan argues that he received ineffective assistance of counsel. Specifically, Duncan claims that counsel should have objected based on his confrontation rights under U.S. Const. amend. VI and XIV and Neb. Const. art. I, § 11, and on rules 401, 403, 801, and Neb. Evid. R. 802, Neb. Rev. Stat. § 27-802 (Reissue 1995). Duncan also claims his trial counsel was ineffective for failing to move for a mistrial. When the issue of ineffective assistance of counsel has not been raised or ruled on at the trial court level and the matter necessitates an evidentiary hearing, an appellate court will not address the matter on direct appeal. *State v. McLemore*, 261 Neb. 452, 623 N.W.2d 315 (2001). We determine that Duncan's argument of ineffective assistance of counsel regarding this issue requires an evidentiary hearing. Thus, we decline the opportunity to consider it here.

### BILL GARTSIDE

In this assignment of error, Duncan argues that the district court erred in finding, over Duncan's objection, that Gartside was an expert witness in the field of hair analysis and in receiving his testimony into evidence. Duncan claims that "[t]he only evidence that Gartside was an expert in the area of hair analysis was his own claim to expertise." Brief for appellant at 42. Duncan also claims that he received ineffective assistance of counsel to the extent that trial counsel failed to object to any portion of Gartside's testimony under rules 401, 402, 403, and 702.

■ The admission of expert testimony is ordinarily within the discretion of the trial court, and its ruling will be upheld in the absence of an abuse of discretion. *State v. Buechler*, 253 Neb. 727, 572 N.W.2d 65 (1998). Four preliminary questions must be answered in order to determine whether an expert's testimony is admissible: (1) whether the witness qualifies as an expert pursuant to rule 702; (2) whether the expert's testimony is relevant; (3) whether the expert's testimony will assist the trier of fact to understand the evidence or determine a controverted factual issue; and (4) whether the expert's testimony, even though relevant and

admissible, should be excluded in light of rule 403. *State v. Thieszen*, 252 Neb. 208, 560 N.W.2d 800 (1997).

Whether a witness is qualified as an expert is a preliminary question for the trial court. *State v. Campbell*, 260 Neb. 1021, 620 N.W.2d 750 (2001). A trial court is allowed discretion in determining whether a witness is qualified to testify as an expert, and unless the court's finding is clearly erroneous, such a determination will not be disturbed on appeal. *Id.* A person may qualify as an expert by virtue of either formal training or actual practical experience in the field. *Id.*

Gartside testified that he has worked as a criminologist in the DNA serology section of the Nebraska State Patrol laboratory since January 1997. In that capacity, Gartside examines evidence for blood, body fluids, and hairs; analyzes that evidence; and writes reports and testifies in court as necessary. He received a bachelor of science degree from the State University of New York and has taken graduate level classes at the University of Nebraska in molecular biology, genetics, and biochemistry. Gartside testified that he has received specialized training in his field from the FBI, Royal Canadian Mounted Police, and others and has authored a number of published articles and papers related to his work. Gartside also stated that he has testified as an expert witness in the area of blood, DNA, and hair analysis on multiple occasions. Gartside described the procedures used to examine hair, including macroscopic and microscopic techniques, and testified that those procedures are recognized in the scientific community as valid. Gartside also testified that at the time of trial, he was the only hair examiner at the State Patrol laboratory. He estimated that he had probably looked at "thousands" of hairs in his career. Given this testimony, the district court was not clearly erroneous in finding that Gartside was qualified to testify as an expert witness in the field of hair analysis.

We have previously recognized the utility of scientific hair analysis in criminal cases. *State v. Harrison*, 218 Neb. 532, 357 N.W.2d 201 (1984). Gartside's testimony that several of the hairs found in Bennett's home were consistent with a sample of hairs obtained from Duncan's dogs could assist the jury in determining if Duncan were guilty of Bennett's murder. The district

court did not abuse its discretion in receiving Gartside's testimony, and trial counsel's failure to object to any portion of Gartside's testimony did not deprive Duncan of effective assistance of counsel. This assignment of error is without merit.

## JEFFREY HARRINGTON

In this assignment of error, Duncan argues that the district court erred in overruling his objections to portions of Harrington's testimony. Harrington lived in the same neighborhood as Bennett and Duncan and had known Duncan for approximately 10 years. Harrington testified that he saw Duncan in that neighborhood on December 4, 1999, and that Duncan seemed "distant" during their brief conversation. The State asked Harrington if Duncan's physical appearance had changed over the time that Harrington had known Duncan. Over Duncan's relevance objection, Harrington testified that Duncan had previously been "handsome," "articulate," and "neat in his appearance." However, Harrington testified that after Duncan had moved into his present neighborhood, Duncan's appearance was "distinctly different . . . so different I remember thinking that his . . . life had taken a different turn." The defense objected to this answer on grounds that it was non-responsive, called for speculation, and lacked foundation. The objection was overruled.

Duncan argues that the district court erred in overruling these objections because the testimony was irrelevant. Evidence is relevant when it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *State v. Davlin*, 263 Neb. 283, 639 N.W.2d 631 (2002). Having reviewed the record, we cannot conceive of any fact or consequence for which evidence of Duncan's changing appearance over the course of almost 10 years may have made more or less probable. However, for the same reasons we articulated above in regard to the court's erroneous receipt of portions of Henthorn's testimony, Duncan's conviction was unattributable to the court's erroneous evidentiary ruling here. See *State v. Brouillette, ante* p. 214, 655 N.W.2d 876 (2003). Duncan's assignment of error is without merit.

## POT IN SINK

Finally, Duncan claims that his trial counsel provided ineffective assistance when he failed to object to Liwaru's testimony that a pot found in Bennett's home belonged to her and Duncan. During her testimony, Liwaru was asked by the State to examine exhibit 53, a photograph depicting Bennett's kitchen. Liwaru was asked if she recognized anything in the photograph. Liwaru replied that she recognized the pot in the sink and further testified that the pot belonged to her and Duncan.

Duncan argues that his trial counsel was ineffective for failing to object to this testimony under rule 403 and Neb. Evid. R. 602 and 901, Neb. Rev. Stat. §§ 27-602 and 27-901 (Reissue 1995). Rule 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by the risk of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Liwaru testified that she and Duncan would occasionally use their pots to get water from the side of Bennett's house. Liwaru also testified that she had never entered Bennett's kitchen and did not give Bennett the pot. Thus, Liwaru's testimony had probative value because it placed Duncan at Bennett's home. For the same reason, the testimony was prejudicial to Duncan. However, the fact that evidence is prejudicial is not enough to require exclusion, because most, if not all, of the evidence a party offers is calculated to be prejudicial to the opposing party. It is only the evidence that has a tendency to suggest a decision on an improper basis that is unfairly prejudicial under rule 403. *State v. Long*, 264 Neb. 85, 645 N.W.2d 553 (2002). Any rule 403 objection Duncan's trial counsel might have made would have been overruled by the court. Therefore, Duncan cannot show that his trial counsel's performance in this respect was deficient.

## CONCLUSION

For the reasons set out above, the judgment of the district court is affirmed.

AFFIRMED.