Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/03/2021 08:10 AM CDT

State of Nebraska, appellee, v.
Daryle M. Duncan, appellant.
___ N.W.2d ___

Filed June 11, 2021.    No. S-20-565.

1. **Motions for New Trial: DNA Testing: Appeal and Error.** A motion for
   new trial based on newly discovered exculpatory evidence obtained pur-
   suant to the DNA Testing Act, Neb. Rev. Stat. § 29-4116 et seq. (Reissue
   2016 & Cum. Supp. 2018), is addressed to the discretion of the district
   court, and unless an abuse of discretion is shown, the court's determina-
   tion will not be disturbed.
2. **Motions for New Trial: DNA Testing: Proof.** To warrant an order for
   a new trial under the DNA Testing Act, the movant must present DNA
   testing results that probably would have produced a substantially dif-
   ferent result if the evidence had been offered and admitted at the mov-
   ant's trial.
3. **Judgments: Words and Phrases.** An abuse of discretion occurs when a
   trial court's decision is based upon reasons that are untenable or unrea-
   sonable or if its action is clearly against justice or conscience, reason,
   and evidence.
4. **DNA Testing: Evidence.** DNA evidence is not a videotape of a crime,
   and testing shows only whether the biological sample in question
   belonged to the person tested against.

Appeal from the District Court for Douglas County: J
Russell Derr, Judge. Affirmed.

Robert W. Kortus, of Nebraska Commission on Public
Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and Melissa R.
Vincent for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ.

Papik, J.

In 2001, Daryle M. Duncan was convicted of first degree murder and use of a deadly weapon to commit a felony. He now appeals a district court order that denied his motion for new trial based on evidence obtained through the DNA Testing Act. Duncan challenges the district court's determination that new DNA evidence acquired from two billfolds found near the victim's body, when considered with the evidence previously presented at his trial, did not warrant a new trial. He also contends that the district court erred in not considering evidence that was not received at trial, but was received during earlier postconviction proceedings. Finding no merit to Duncan's arguments, we affirm.

BACKGROUND

*Convictions, Sentences, and Direct Appeal.*

Following a jury trial in 2001, Duncan was convicted of first degree murder and use of a deadly weapon to commit a felony, in connection with the death of Lucille Bennett. Bennett was discovered in her home at 10:30 a.m. on December 5, 1999, dead from a knife wound to the right side of her neck. There were no signs of forced entry. Some billfolds were found near Bennett's body. The billfolds did not contain valuables and did not yield fingerprint evidence. Money orders obtained by Bennett were cashed after her death.

At Duncan's trial, his ex-wife Jaahlay Liwaru testified on behalf of the State. Duncan and Liwaru had previously lived across the street from Bennett. Liwaru testified that Bennett generally did not let anyone into her house, but she had allowed Liwaru and Duncan inside to use her telephone on different occasions.

In December 1999, Liwaru was residing at a drug treatment center. She testified that she was expecting Duncan to deliver money from her government assistance check to her at the

treatment center, but that Duncan did not deliver the money. Liwaru testified that between 1 and 3 a.m. on December 5, 1999, Duncan called her and said that he had "messed up" her money and that he was trying to get it back. He also said that the "lady across the street" had been murdered. Liwaru testified that Duncan told her the woman had "gotten sliced from . . . neck to neck . . . and she got stabbed up." Duncan said that he was going to go to hell, and Liwaru, believing Duncan meant he would go to hell for spending the money that he had agreed to deliver to her, said he would not be going to hell because of that. According to Liwaru, Duncan replied, "[W]hat if I told you I killed Ms. Bennett." Liwaru immediately told another patient about Duncan's call, and the other patient later corroborated this version of Liwaru's account at trial.

Liwaru testified that Duncan called her again shortly after 10 a.m. on the same day. Duncan told Liwaru that he had seen Bennett's body being removed from her home; however, other testimony established that Bennett was not removed from her home until later that evening. Immediately after Duncan's second call, Liwaru told an employee of the drug treatment center that her neighbor had been murdered and robbed. The employee later testified and confirmed Liwaru's testimony.

On cross-examination, Liwaru admitted that she told police that Duncan's telephone calls may have occurred on December 6, 1999, or on the evening of December 5, and that she had shared "a couple" versions of the calls with police. She also denied that Duncan had told her he was involved in Bennett's murder.

One of Bennett's neighbors, who was acquainted with Duncan, testified that he saw Duncan in Bennett's neighborhood on December 4, 1999.

A criminologist from the Nebraska State Patrol laboratory testified that his examination of hairs found at Bennett's home showed several of them to be consistent with hair samples from Duncan's dogs. Another hair found at Bennett's house was similar in some respects to a sample collected from

Duncan, but it was also dissimilar to Duncan's hair in some ways, mainly the manner in which it was cut.

The parties offered into evidence two stipulations concerning the results of DNA testing performed on several items of evidence. The stipulations showed that most of the results were inconclusive, but Duncan could not be excluded as a donor of blood found on Bennett's bedding and was excluded as a contributor to DNA found on the knife used to kill Bennett.

During closing arguments, the State asserted that the billfolds near Bennett appeared to have been emptied, suggesting that Bennett had been murdered during a robbery. The State also emphasized that the absence of fingerprints other than Bennett's at the scene did not exclude Duncan or show that he did not commit the crimes. Closing remarks by Duncan's counsel framed the parties' stipulations as demonstrating that "the DNA didn't show anything."

Duncan received consecutive sentences of life imprisonment on the murder conviction and 19 to 20 years' imprisonment for use of a deadly weapon to commit a felony. In 2003, this Court affirmed Duncan's convictions and sentences on direct appeal. See *State v. Duncan*, 265 Neb. 406, 657 N.W.2d 620 (2003).

*2008 Postconviction Proceedings.*

Duncan filed a series of motions for postconviction relief, alleging, among other things, that he received ineffective assistance of counsel at trial and on appeal. At an evidentiary hearing in 2008, Duncan attempted to demonstrate that trial counsel was ineffective in failing to show that Liwaru's narrative was fabricated due to coercion by the police and that counsel failed to properly investigate evidence of a particular alternative suspect.

The district court entered an order denying Duncan's motion for postconviction relief. In relevant part, the district court found that (1) the police did not use coercive tactics to obtain Liwaru's statements, and Liwaru's affidavit to the contrary

was belied by the transcripts from her interviews with police, and (2) Duncan's suggested alternative suspect was not a viable suspect in Bennett's murder because, other than living in the area, there was no evidence linking that individual to the crime and Bennett's murder did not fit the modus operandi of his other crimes.

Duncan appealed the district court's order, and we affirmed. See *State v. Duncan*, 278 Neb. 1006, 775 N.W.2d 922 (2009). We did not reach the merits of Duncan's allegations of ineffective assistance of trial and appellate counsel involving police coercion of Liwaru and his alternative suspect theory because the claims were either procedurally barred or not assigned on appeal.

*Motion for DNA Testing.*

Years after Duncan's motion for postconviction relief was denied, he moved for DNA testing pursuant to the DNA Testing Act, Neb. Rev. Stat. § 29-4116 et seq. (Reissue 2016 & Cum. Supp. 2018). Duncan sought DNA testing on three billfolds— a red billfold and a black billfold, both found near Bennett's body on the bed, and a white billfold found on a dresser next to the bed. At a hearing on Duncan's motion, Duncan offered into evidence a partial transcript from his trial and photographs depicting the location of the billfolds at the crime scene. The excerpts from trial showed that the State's case was based on the theory that Duncan killed Bennett during a robbery. The district court granted Duncan's motion for DNA testing.

*Motion for New Trial.*

After obtaining the results of the DNA testing, Duncan filed a motion pursuant to Neb. Rev. Stat. § 29-4123(2), requesting a hearing and order finding that the results exonerated him. In the alternative, he moved for a new trial pursuant to Neb. Rev. Stat. § 29-2101(6) (Reissue 2016), and submitted a supporting affidavit. It is the motion for new trial that is at issue in this appeal.

At a hearing on the motions, Duncan offered into evidence the deposition and report of Mellissa Helligso, the forensic DNA analyst who performed the ordered testing, and a volume of the bill of exceptions from his 2008 postconviction proceedings, with exhibits that included trial proceedings. Upon the State's request, the district court took judicial notice of the entire bill of exceptions and court files.

Helligso's deposition and report reflected that only the red and black billfolds produced partial DNA profiles capable of comparison analysis; the white billfold did not yield enough DNA to make any scientific findings. Helligso analyzed DNA samples from the red and black billfolds using "STRmix," a probabilistic genotyping program that generates "likelihood ratios." The parties stipulated that STRmix was a valid scientific test. Helligso determined that each billfold contained a mixture of two individuals and calculated the likelihood that the profile matched (1) Duncan and one unknown individual versus two unknown individuals and (2) Bennett and one unknown individual versus two unknown individuals.

For the red billfold, Helligso testified that the amount of DNA found was "very low," which typically would result in less informative statistics associated with that profile. Helligso concluded that it was at least 16 times more likely the profile from the red billfold originated from two unknown individuals than from Duncan and one unknown individual and that it was at least 1,400 times more likely the profile originated from two unknown individuals than from Bennett and one unknown individual. Helligso explained that neither ratio supported a conclusion that Duncan or Bennett was a contributor. However, she testified that STRmix could exclude a person as a contributor and confirmed that neither Bennett nor Duncan could be excluded as a contributor to the DNA on the red billfold.

As to the black billfold, Helligso's results showed that it was at least 40 times more likely that the profile originated from two unknown individuals than from Duncan and one unknown

individual. Helligso testified that this ratio did not support a conclusion that Duncan was a contributor. Helligso determined that it was equally likely the profile originated from two unknown individuals as from Bennett and one unknown individual and that this ratio was "uninformative," meaning that no conclusions could be drawn from it.

Helligso testified that skin or touch DNA is more likely to produce a partial profile than blood or semen and that it can be removed by further touching of an item.

*District Court's Order.*

The district court denied Duncan's request for an order finding that the DNA test results exonerated him and denied his motion for new trial.

Relevant to the motion for new trial and to this appeal, the district court considered whether there was newly discovered exculpatory DNA evidence of such a nature that if it had been offered and admitted at the former trial, it probably would have produced a substantially different result. It concluded that the "low grade and low probability DNA results" from the two billfolds would not have produced a different result, pointing to the fact that Duncan had told Liwaru details that only Bennett's killer would know and that the jury heard argument that Duncan's DNA was not found at the scene.

The district court rejected Duncan's argument that if robbery was the motive, as posited by the State at trial, the person responsible for Bennett's death would have left DNA on the billfolds. The district court reasoned that one could also suppose that the perpetrator had worn gloves or fled the crime scene for any number of reasons after killing Bennett, without touching the billfolds. It stated that perhaps "the murderer . . . fled the scene . . . for whatever reason without touching the billfolds—perhaps the murderer became frightened by what had just happened, perhaps heard a noise, perhaps did not see the billfolds despite their placement." It also reiterated that the jury was informed that no DNA evidence pointed to Duncan.

The district court further reasoned that the new DNA evidence would not call into question the credibility of any witness, as no witness had testified to seeing Duncan touch the billfolds and the new DNA evidence would not have excluded Duncan from being in Bennett's home. In this way, the district court distinguished this case from *State v. Parmar*, 283 Neb. 247, 808 N.W.2d 623 (2012), which we discuss in detail below.

In reaching its decision, the district court did not consider the evidence offered at Duncan's earlier postconviction proceedings but not offered at trial.

Duncan timely appeals the portion of the order denying his motion for new trial.

### ASSIGNMENTS OF ERROR

Duncan assigns that the district court erred in (1) not considering evidence from his 2008 postconviction proceedings and (2) denying his motion for new trial.

### STANDARD OF REVIEW

[1] A motion for new trial based on newly discovered exculpatory evidence obtained pursuant to the DNA Testing Act is addressed to the discretion of the district court, and unless an abuse of discretion is shown, the court's determination will not be disturbed. *State v. El-Tabech*, 269 Neb. 810, 696 N.W.2d 445 (2005).

### ANALYSIS

At issue in this appeal is Duncan's motion for new trial pursuant to § 29-2101(6). Under that subsection, a court may order a new trial if the newly discovered exculpatory DNA evidence is of such a nature that if it had been offered and admitted at the former trial, it probably would have produced a substantially different result. See *State v. Buckman*, 267 Neb. 505, 675 N.W.2d 372 (2004). Applying this standard, the district court denied Duncan's request for a new trial. On appeal, Duncan claims the district court did not consider all of

the evidence available to it and that even based on the limited evidence the district court did consider, a new trial was warranted. On both points, we disagree and conclude that the trial court did not abuse its discretion in denying Duncan's motion for new trial.

*Evidence to Be Considered.*

We begin with Duncan's assertion that the district court erred in not considering evidence received at postconviction proceedings in 2008, which he claims was relevant to his motion for new trial. Duncan claims this evidence showed that Liwaru's narrative of her telephone calls with Duncan was coerced by police and therefore probably not reliable. Duncan also contends that evidence produced in postconviction proceedings supported his contention that an alternative suspect killed Bennett. According to Duncan, this evidence would have been admitted as relevant evidence if offered at trial, and therefore, the district court should have taken it into account in assessing his motion for new trial.

[2] As the State correctly points out, however, we have not interpreted § 29-2101(6) to allow evidence that was not received at trial, aside from "newly discovered exculpatory DNA or similar forensic testing evidence obtained under the DNA Testing Act," to be considered in deciding whether the defendant is entitled to a new trial under that subsection. As noted, we have consistently held that the question when such motions are filed is whether the defendant would have obtained a substantially different result if the newly discovered evidence had been presented at the *former trial*. See *State v. Buckman*, 267 Neb. at 517, 675 N.W.2d at 382, quoting *Ogden v. The State*, 13 Neb. 436, 14 N.W. 165 (1882) ("'general rule as to newly discovered evidence may be stated thus: That if, with the newly discovered evidence before them, the jury should not have come to the same conclusion, a new trial will be granted'"). We have also explained, "[T]o warrant an order for a new trial under the DNA Testing Act, the movant must

present DNA testing results that probably would have produced a substantially different result if the evidence had been offered and admitted *at the movant's trial*." *State v. Parmar*, 283 Neb. 247, 255, 808 N.W.2d 623, 629 (2012) (emphasis supplied).

We have applied the same evidentiary limitation in determining whether a conviction should be vacated or set aside in circumstances where the DNA testing results are either completely exonerative or highly exculpatory. See *State v. Buckman, supra.* To resolve that question, we consider the DNA testing results "with the evidence of the case which resulted in the underlying judgment." See *id.* at 518, 675 N.W.2d at 383. See, also, § 29-4123(2). For purposes of the evidence to be considered, we do not see how a motion for new trial under § 29-2101(6) and a motion to vacate or set aside a conviction based on newly discovered DNA evidence are meaningfully different. Although the respective motions require different showings, each requires courts to weigh the effect of newly discovered evidence. See *State v. Buckman, supra*.

Our understanding that a court presented with a motion for a new trial under § 29-2101(6) can only consider newly discovered DNA or similar forensic testing evidence and evidence offered at the former trial is supported by the rest of § 29-2101. Subsection (5) of § 29-2101 permits defendants to seek a new trial based on newly discovered evidence that is not DNA or similar forensic testing evidence obtained through the DNA Testing Act. Duncan did not, however, file a motion under § 29-2101(5), and even if he had, such a motion would not have been timely raised. Duncan was aware of the evidence no later than 2008, when he moved for postconviction relief. See Neb. Rev. Stat. § 29-2103(4) (Reissue 2016).

The evidence that Duncan argues the district court erred by not considering was not presented to the jury at his former trial and was not newly discovered DNA or similar forensic testing evidence as contemplated by § 29-2101(6). Therefore, we conclude that the district court was correct not to consider it.

*Entitlement to New Trial.*

Duncan contends that even without the evidence from his postconviction proceedings, the district court abused its discretion in denying his motion for new trial. He primarily asserts that because the DNA test results tend to suggest that he did not touch the red and black billfolds, they contradict the State's theory at trial that Duncan killed Bennett during a robbery. Under a robbery theory, Duncan rates the probability that the billfolds would have been handled by the perpetrator as "exceedingly high." Brief for appellant at 35. Using the same reasoning, Duncan also argues that the DNA test results are incompatible with Liwaru's testimony that placed him at the scene of the crime because whoever killed Bennett would have handled the billfolds during the robbery. Again, we are not persuaded.

[3] We do not believe the district court abused its discretion by not finding that had the newly discovered DNA evidence been offered and admitted at Duncan's former trial, it probably would have produced a substantially different result. See *State v. Buckman*, 267 Neb. 505, 675 N.W.2d 372 (2004). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Oldson*, 293 Neb. 718, 884 N.W.2d 10 (2016). As we explain below, the record and our case law support the district court's decision.

We do not consider the DNA test results to be as convincing as Duncan does. Although the DNA test results did not support the conclusion that Duncan was a contributor to the samples taken from the red and black billfolds, Helligso testified that he could not be excluded as a contributor to at least one of the billfolds. In addition, the same round of testing did not support the conclusion that Bennett herself was a contributor to the DNA sample taken from her own red billfold, and results as to Bennett for her black billfold were "uninformative."

[4] Further, as the district court recognized, there are many reasons why the perpetrator of the crimes may not have left DNA evidence on the billfolds. As we have said, "DNA evidence is not a videotape of a crime, and the nonpresence of an individual's DNA profile in a biological sample does not preclude that individual from having been present or in possession of the item tested." *State v. Myers*, 304 Neb. 789, 800, 937 N.W.2d 181, 188 (2020). We have also recognized that if DNA testing does not detect the presence of a movant's DNA on an item of evidence, such a result is at best inconclusive, especially when there is other credible evidence tying the defendant to the crime. See *State v. Amaya*, 305 Neb. 36, 938 N.W.2d 346 (2020).

Here, the new DNA evidence did nothing to contradict other evidence of Duncan's guilt presented at trial. Before Bennett was discovered dead from a knife wound to her neck, Duncan told Liwaru over the telephone that Bennett had been murdered. Duncan described a knife injury to Bennett's neck and effectively admitted that he had killed her. Liwaru's accounts of Duncan's telephone calls were corroborated by other witnesses. A neighbor testified to seeing Duncan in the neighborhood around the time of Bennett's murder. Crime scene investigation showed no signs of forced entry at Bennett's house, and Duncan was someone who Bennett had previously allowed inside to use the telephone. Duncan needed money at the time of Bennett's murder, and money orders that had been obtained by Bennett were cashed after her death. Hairs consistent with Duncan's dogs were found at the crime scene.

Like the district court, we see similarities between this case and *State v. El-Tabech*, 269 Neb. 810, 696 N.W.2d 445 (2005), where we concluded that the district court did not abuse its discretion in denying the movant's motion for new trial based on DNA evidence. In that case, the movant was convicted of murdering his wife. A tuft of hair was found in the knot of a cloth bathrobe belt used to strangle the victim. There was expert testimony at trial that seven hairs found in the tuft were

consistent with the victim's hair, but another hair that had fallen from the belt did not belong to the victim or the movant. Postconviction DNA testing showed that the hair that had fallen from the belt belonged to the movant but that one of the hairs in the knot belonged to neither the movant nor the victim.

On appeal from the denial of the movant's motion for new trial in *El-Tabech*, we affirmed. We reasoned that although the hair of unknown origin was not the same hair that the expert had testified about at trial, the jury was nonetheless presented with evidence that a hair belonging to neither the victim nor the movant was found at the scene. Citing other circumstantial trial evidence of the movant's guilt, including his presence at the scene and recent marital conflict with the victim, we concluded that the district court did not abuse its discretion in denying the motion for a new trial.

In both this case and *El-Tabech*, if the new DNA evidence had been offered at the former trial, it would not have materially altered the evidentiary picture. At Duncan's trial, the jury heard evidence and arguments that, aside from the hairs found in Bennett's house that were consistent with Duncan's dogs and one hair that shared some characteristics with Duncan's, DNA and other physical evidence did not tie Duncan to the crime, and postconviction DNA testing offered the same ultimate conclusion. Specifically, as to the red and black billfolds, the new DNA testing did not support the conclusion that Duncan was a contributor. Thus, even with the addition of the new DNA evidence, there would be a dearth of physical evidence and substantial circumstantial evidence of Duncan's guilt.

Duncan urges that *State v. Parmar*, 283 Neb. 247, 808 N.W.2d 623 (2012), supports his argument and that the district court erred in distinguishing it. In that case, we held that new DNA evidence merited a new trial. At the initial trial, two eyewitnesses testified that the movant had assaulted the victim and bound him in a bedroom and that the movant was the only male present at the scene of the crime other than the victim, who later died. Following his conviction for first

degree murder, the movant obtained DNA testing of a bedsheet. The results showed the presence of male DNA but completely excluded the movant as a contributor. After the district court denied the movant a new trial based on the new DNA evidence, we reversed, and remanded for a new trial. We reasoned that even though the DNA test results did not exonerate the movant, they tended to create a reasonable doubt that he participated in the crime because they were clearly incompatible with the eyewitnesses' testimonies.

We agree with the district court that *Parmar* is distinguishable from the case at hand. Unlike in *Parmar*, Duncan was not completely excluded as a contributor. Although the likelihood ratios produced here did not support the conclusion that Duncan was a contributor, for at least one of the billfolds, Helligso testified that Duncan could not be excluded as a contributor, something STRmix has the ability to do. Further, the DNA evidence in *Parmar* directly contradicted the eyewitness testimonies identifying the movant as the lone male at the scene of the crime, other than the victim. Here, there was no direct evidence that Duncan touched the billfolds, and even if the new DNA evidence is interpreted to show that he did not, it is not incompatible with other evidence of Duncan's guilt, most notably his conversations with Liwaru.

Duncan points out that *Parmar* does not require DNA test results to be absolutely and completely exclusionary to entitle a movant to a new trial. He is correct that in *Parmar*, we stated that even if the evidence excluding the movant as a contributor did not prove the eyewitness accounts to be false, it certainly made their version of the facts less probable, and to obtain a new trial, a movant was not required to show DNA testing results undoubtedly would have produced an acquittal at trial. For this reason, Duncan argues, the district court's consideration of possibilities that might explain the probable absence of Duncan's DNA on the billfolds was not proper, because those issues should have been settled upon retrial. We do not agree. In considering these possibilities, the district court cogently

analyzed the likelihood that the result would be substantially different on retrial. This was not only permissible; it was the very standard the district court was to apply in deciding whether Duncan was entitled to a new trial.

We engaged in a similar weighing of possibilities in *Parmar*. There, the sample from which new DNA testing excluded the movant was a mixed sample of the victim's blood and another male contributor. We entertained the possibility that a male other than the movant had deposited blood on the bedsheet before the murder in exactly the same spots where the victim's blood was later found, but we decided the scenario was more speculative than concluding that a male other than the movant was present during the crime. Therefore, we concluded that the addition of the new DNA evidence probably would have produced a substantially different result if presented at the former trial.

As we have explained, however, the facts of this case are different. The alternative explanation explored in *Parmar* required an implausible coincidence, but that is not so here. For reasons similar to those articulated by the district court, it strikes us as plausible that the perpetrator in this case did not touch the billfolds with bare hands. We find no abuse of discretion in the district court's mode of analysis or in its overall conclusion that the DNA testing results probably would not have produced a substantially different result if they had been presented at Duncan's former trial.

## CONCLUSION

For reasons we have explained, we affirm.

AFFIRMED.

FREUDENBERG, J., not participating.